# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

VICKIE ALDAY,

    Plaintiff,

    vs.

MARLON L. GROOVER, State
Trooper, in his individual
capacity,

    Defendant.

CV 212-108

## ORDER

Presently before the Court is Defendant's Motion for Summary Judgment. Dkt. No. 31. Upon due consideration, Defendant's motion is **GRANTED**.

## I. Factual Background

This case arises from a state trooper arresting an individual for driving under the influence of alcohol, and the subsequent tasering of the individual in a detention center's sally port. The relevant facts are taken principally from Defendant's Statement of Material Facts and Plaintiff's response thereto. See Dkt. Nos. 31-2; 35. Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56.1, all material facts

not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and presents all evidence in the light most favorable to the plaintiff. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

On June 1, 2010, at around 6:00 p.m., Defendant Marlon Groover ("the Officer") was patrolling Georgia Highway 27 in Wayne County pursuant to his duties as a trooper for the Georgia State Patrol. Dkt. No. 31-2 ¶ 1. At the same time, Plaintiff Vickie Alday was driving a Ford Excursion along the same stretch of road, just a few hundred yards ahead of the Officer.[1] Id. ¶ 2. Alday was driving home from visiting her extended family in Perry, Georgia. Id. ¶¶ 9, 12. Before she departed, she had congregated with family members at her cousin's home in Perry and was given a bottle of vodka as a gift. Id. ¶ 12. She admits to having "two or three drinks" before leaving. Id. ¶ 13; 32-1, at 54:21-23.

---

[1] Groover's car was equipped with a camera on the dash that recorded both audio and video of the arrest and transport to the jail, although only video was recorded in the sally port. Dkt. No. 31-2 ¶ 3. "[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible." Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013). The Court has reviewed the video, and it informs the Court's recitation of facts. In the case at bar, this is important because Plaintiff does not remember most of the events recorded, yet makes general denials to Defendant's statement of material facts, which is often supported by the video. The Court endeavored to state the video's contents accurately and in the light most favorable to Plaintiff.

The Officer observed Alday veer out of the lane and onto the shoulder of the road. Dkt. No. 31-2 ¶ 4. This caused Groover to activate his patrol lights to initiate a traffic stop. Id. ¶ 5. While attempting to pull over to the shoulder, Alday's tires kicked up dirt. Id. ¶ 6. After initiating the traffic stop, the Officer pulled behind the stopped Excursion and exited his own vehicle. Id. ¶ 14. Standing at the back left corner of the Excursion, the Officer requested Alday to get out of the vehicle and join him where he stood. Id. Alday knew from the moment she was pulled over that Groover was a trooper with the Georgia State Patrol. Id. ¶ 32.

Alday testifies that she complied with the Officer's commands during the traffic stop "as far as [she] recall[s]," but does not recollect the Officer trying to determine whether she had been drinking. Dkt. No. 32-1, at 75-76. The video indisputably shows, however, that the Officer made such an investigation. The Officer asked Alday whether she had anything to drink that evening, which she denied. Dkt. No. 31-2 ¶ 17. He asked whether she was sure; she said she was sure. The Officer asked if there was anything in the vehicle that he should know about; she said there was not. Id. The Officer asserted that he smelled alcohol coming off of Alday's breath. The Officer again asked whether she had any alcohol; she said

AO 72A
(Rev. 8/82)

she did not. He asked again whether she was sure; she then admitted to having alcohol at her aunt's house. Id. ¶ 18.

The Officer administered a horizontal gaze nystagmus test to assess whether Alday was intoxicated; he allowed Alday to repeat it several times. Id. ¶ 19. At least twice, Alday moved her head while following the stimulus. Next, the Officer administered a "one-leg test" to evaluate her balancing abilities. See id. ¶ 20. Finally, the Officer administered a breathalyzer test, although the breathalyzer was unable to assess her blood alcohol level at the time. Id. ¶ 21. The Officer then detained Alday and told her that she was under arrest for driving under the influence of alcohol. Id. ¶¶ 22-23. The Officer interacted with Alday for a little less than ten minutes before placing her under arrest. Id. ¶ 24.

After securing Alday in his vehicle, Groover approached Alday's Excursion to search it. Id. ¶ 28. From the front passenger area of Alday's vehicle, he pulled out a cup and bottle of vodka. Id. ¶ 29. While the Officer and Alday waited for a tow truck to retrieve her vehicle, the Officer informed Alday that he was taking her to jail. Id. ¶ 30; Dkt. No. 35 ¶ 30.

A cage separating the patrol car's front seat from its backseat impeded air conditioning, causing the backseat to feel hot. See Dkt. No. 31-2 ¶ 31. The heat made Alday uncomfortable

AO 72A
(Rev. 8/82)

and nauseous. Id.; Dkt. No. 35 ¶ 31. The Officer waited to depart for the Wayne County Jail until after Alday's vehicle was secured on a tow truck. Dkt. No. 31-2 ¶ 34. Shortly after departure, Alday asked Groover, "Where are you taking me?" Id. ¶ 35. The Officer responded that he was taking her to "Wayne County" so that she could take a "chemical test" that he had earlier described to her. Id. Alday asked why Groover was taking her to Wayne County. Id. ¶ 36. The Officer responded that he stopped her in Wayne County and that her vehicle was being taken to Wayne County. Id.

En route to the detention center, Alday experienced acid reflux that would have made her sick had she swallowed it, so she "just leaned over and spit it into [what she thought was a] blanket." Dkt. No. 32-1, at 81-82. It was actually a jacket. Dkt. No. 31-2 ¶ 38. The Officer stopped his car to remove the jacket from Alday's reach. Id. The manner in which the Officer removed his jacket from Alday suggested to her that he was "angry." Id. The Officer stated that he would "charge [Alday's] behind" for spitting on his jacket. Id. ¶ 39. After the Officer closed the door and while he deposited his jacket in the patrol car's trunk, he called Alday a "nasty-ass." Id. ¶ 40.

Prior to arriving at the Wayne County Jail, the Officer called dispatch and requested that jail personnel turn on a

breathalyzer machine to allow it to warm up.  Id. ¶ 41.  When the Officer pulled up to the Wayne County detention center, he had to wait to gain access to the secure sally port.  Id. ¶ 42. When the Officer pulled into the sally port, he parked and exited his patrol vehicle to retrieve Alday from the back seat. Id. ¶ 43.  As the Officer exited the vehicle, the door to the sally port closed.  Id. ¶ 44.  By this point, Alday had been handcuffed in the patrol car for nearly one hour.  Id. ¶ 45.  At Alday's deposition, she said that she had "no clue" where she was when they arrived at the Wayne County detention center. Dkt. No. 32-1, at 85-86.

The Officer opened the back passenger side door and told Alday to get out.[2]  Dkt. Nos. 31-2 ¶ 47; 32-1, at 87:4-6.  Alday asked the Officer to "please have somebody accompany us into the building."  Dkt. Nos. 31-2 ¶ 49; 32-1, at 88:5-7.  Alday was not "loud or demanding" when she made her request.  Dkt. No. 31-2 ¶ 49.  Ten seconds after the Officer gave Alday the initial instruction to exit the vehicle, he removed his Taser from his utility belt and pointed it toward Alday.  Id. ¶ 50.  After pulling his Taser out, the Officer gave Alday another 27 seconds to comply with his demand that she exit the vehicle.  Id. ¶ 51. All told, the Officer gave Alday 37 seconds to comply.  Id.

---

[2] A video in the sally port recorded the Officer's exit and attempt to remove Alday from the vehicle.  Dkt. No. 31-2 ¶ 46.  The Court has reviewed the video.

AO 72A
(Rev. 8/82)

¶ 52.  Near the end of the 37 seconds, the Officer removed the prongs cartridge from the Taser and entered the back seat of the vehicle.  Id. ¶ 54.  Alday was seated "straight up" near the middle of the back seat when the Officer entered the vehicle. Id. ¶ 55.  Inside the vehicle, the Officer applied the Taser to the base of Alday's neck for five or ten seconds.  Id. ¶ 56. The Officer was trained that he should not apply the Taser to a suspect's neck; instead, he had been trained to apply the Taser to the shoulder.  Id. ¶ 57.  Thereafter, Alday exited the vehicle.  Id. ¶ 58.  Alday followed Groover's instructions as she walked around the back of the patrol car and entered the intake area of the jail.  Id. ¶ 59.

When a DUI test was administered, Alday's blood alcohol content was 0.178.  Dkt. No. 31-7, at 4.  Groover charged Alday with driving under the influence, possession of an open container of alcohol in a vehicle passenger area, failure to maintain her lane, obstruction of a law enforcement officer, and interference with government property.  Dkt. No. 31-2 ¶ 63.  On February 2, 2011, the case against Alday was dead docketed. Dkt. No. 31-7, at 4.

As a result of being handcuffed, Alday's hands and wrists were bruised.  Dkt. No. 31-2 ¶ 64.  The Taser caused two small burn marks on Alday's neck, causing moderate pain for "a few days."  Id. ¶ 65.  Alday was "healed" after a "few weeks," with

AO 72A
(Rev. 8/82)

no scarring.  Id.  Alday self-treated the injuries to both her

wrists and neck.  Id. ¶ 66.  However, she still suffers

psychological harm from "Defendant's misconduct."  Id. ¶ 65.

In turn, Groover also suffered a consequence: loss of

employment.  He resigned after an administrative investigation

concluded that he had "better options" available than use of the

dry-stun Taser.  Dkt. No. 37-1, at 3-4, 19.  It was also

determined that he first contended that Alday kicked at him, yet

this was not true.  Id. at 20; Dkt. No. 31-3, at 2, 4.  As

examined in more detail below, it is the Court's responsibility

to determine not whether Groover should keep his job, but

whether his actions violated the Constitution.

## II. Procedural Background

On May 31, 2012, Plaintiff Vickie Alday sued Defendants

Marlon Groover and Colonel Mark McDonough, Commissioner of the

Georgia Department of Public Safety, under various federal and

state law causes of action.[3]  See Dkt. No. 1.  On February 4,

2013, the Court dismissed Commissioner McDonough—and thus a

failure-to-train claim pleaded exclusively against him—because

he was not served within 120 days of Plaintiff's filing the

complaint.  See Dkt. Nos. 1; 21.  Afterward, Groover remained as

the only defendant in the action.  On July 26, 2013, Defendant

---

[3] Each claim is discussed in detail infra Part IV.

AO 72A
(Rev. 8/82)

filed a Motion for Summary Judgment. Dkt. No. 31. Defendant's motion has been fully briefed. Dkt. Nos. 31; 35; 42.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the

AO 72A
(Rev. 8/82)

burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

## IV. Discussion

### A. Federal Law Claims

#### 1. Unlawful Arrest

Count 3 asserts a claim for unlawful arrest under the Fourth Amendment.  Dkt. No. 1 ¶ 32.  In addition, Count 1 asserts that Defendant "violated Plaintiff's rights to due process under the United States Constitution."  Id. ¶¶ 25-27.

##### a. Fourteenth Amendment

It is uncertain whether Count 1 asserts an additional claim under the Fourteenth Amendment or simply acknowledges that the Fourth Amendment is applicable to states via the Fourteenth Amendment.  Regardless of Plaintiff's intent, her claim for false arrest is "firmly anchored to the Fourth Amendment's guarantee against unreasonable searches and seizures."  Walker v. Briley, 140 F. Supp. 2d 1249, 1260 n.8 (N.D. Ala. 2001). Therefore, the Fourth Amendment guides the Court's analysis. See Graham v. Connor, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the

AO 72A
(Rev. 8/82)

guide for analyzing these claims."). Summary judgment is proper on Plaintiff's claim for false arrest under the Fourteenth Amendment.

### b. Fourth Amendment

Likewise, Plaintiff's Fourth Amendment claim fails. "The Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause." Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" Gerstein v. Pugh, 420 U.S. 103, 111-12 (1975) (alteration in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). However, even if there was no actual probable cause, "[q]ualified immunity applies when there was arguable probable cause for an arrest." Crosby, 394 F.3d at 1332 (citing Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)). "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." Id. at 1332-33 (emphasis added). Of course, whether there is arguable or actual probable cause depends on the elements of the crime suspected. Id. at 1333.

AO 72A
(Rev. 8/82)

Groover, at a minimum, could have reasonably believed that he had probable cause to arrest Alday for DUI. Alday was charged under O.C.G.A. § 40-6-391(a)(1). Dkt. No. 31-3, at 1. Under this statute, it is an offense for a person to "drive or be in actual physical control of any moving vehicle while . . . [u]nder the influence of alcohol to the extent that it is less safe for the person to drive." O.C.G.A § 40-6-391(a)(1). In the case at bar, the Officer observed Alday cross the fog line at least twice. See Acree v. State, 319 Ga. App. 854, 855 (2013) (justifying a stop when a video showed a driver's car briefly touching the center line and then drift back to touch the right fog line). After denying multiple times that she had consumed alcohol, Alday admitted that she drank before driving. See Kellogg v. State, 288 Ga. App. 265, 270(2) (2007) (finding probable cause for DUI arrest from the person's admission to drinking, among other evidence). Further, the video shows that Alday appeared to have some trouble keeping steady and performing the Officer's sobriety tests. Therefore, the Court finds that, at the very least, Groover could have believed that he had probable cause to arrest Alday for DUI, thereby entitling him to qualified immunity. Summary judgment is proper on Alday's Fourth Amendment claim for false arrest.

AO 72A
(Rev. 8/82)

## 2. Excessive Force

Count 3 asserts a claim for excessive force under the Fourth Amendment. Dkt. No. 1 ¶ 31. While several of the incidents of force are minor and well within the realm of reasonability, the use of the Taser requires greater analysis. Through the lens of the Fourteenth Amendment,[4] the Court concludes that Defendant is entitled to qualified immunity.

### a. Determining the Applicable Amendment

As an initial matter, the Court must determine what specific constitutional standard governs Plaintiff's claim for excessive force. See Graham, 490 U.S. at 394 ("The validity of the claim must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."). Because Plaintiff seeks redress for Groover's actions while she was an arrestee in custody at a police station, the Fourteenth

---

[4] Although other alleged incidents of excessive force—that is, being handcuffed, pushed against a car, and seated in a warm area—occurred during Alday's seizure and thus should be analyzed under the Fourth Amendment, the Court's analysis focuses on the use of a Taser. As to these other alleged incidents of force, the alleged force would be permitted under either the Fourth Amendment's or Fourteenth Amendment's standard because the force and resulting harm were trivial. See, e.g., Rodriquez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."); Lindsey v. Alabama, No. 12-0053-CG-M, 2012 WL 3137983, at *8 (S.D. Ala. July 5, 2012) (finding that placing an arrestee in a backseat that caused heat exhaustion was not excessive force). At the very least, Groover would be entitled to qualified immunity. See e.g., Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (per curiam) (providing qualified immunity to officers pushing a suspect against a wall); Gold v. City of Miami, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (per curiam) (finding that qualified immunity certainly existed for applying handcuffs for 20 minutes, which caused only skin abrasions).

AO 72A
(Rev. 8/82)

Amendment governs the analysis.[5]  See Carter v. DeKalb Cnty., 521
F. App'x 725, 729 (11th Cir. 2013) (per curiam) ("Claims
involving the mistreatment of arrestees in custody 'are governed
by the Fourteenth Amendment's Due Process Clause instead of the
Eighth Amendment's Cruel and Unusual Punishment Clause, which
applies to such claims by convicted prisoners.'" (emphasis
added) (quoting Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th
Cir. 1996))).

---

[5] Plaintiff contends that the Court should analyze her excessive force claim
under the Fourth Amendment. Dkt. No. 35, at 12-14. Instead, the Court finds
the Fourteenth Amendment to be more appropriate given that Plaintiff had been
detained without incident for over an hour, was in custody at a detention
center, and was located several miles away from where her arrest was actually
effectuated. Even if the Court analyzed Groover's use of a Taser under the
Fourth Amendment, Groover would be entitled to qualified immunity. Although
the severity of the crime, driving under the influence, and low threat posed
by Alday would cut for finding the use of a Taser to be excessive, her
noncompliance to an officer's orders would cut for reasonableness. See,
e.g., Buckley v. Haddock, 292 F. App'x 791, 793-94 (11th Cir. 2008) (finding
the discharge of a prong-mode Taser to be reasonable against an arrestee at
night who would not stand up from the road per the officer's requests); Proch
v. DeRoche, No. 3:08cv484/MCR/EMT, 2011 WL 6841319, at *8 (N.D. Fla. Dec. 20,
2011) ("[E]ven if [an arrestee] did not physically struggle, show overt
aggression, or otherwise fight prior to being tased, the actions in which
[the arrestee] admittedly engaged—including refusing to obey commands and
placing his hands in front of him on a wall instead of behind him—amounted to
active resistance to arrest."); Godman v. City of Largo, No. 8:08-cv-00333-
JDW-TBM, 2009 WL 1651524, at *4 (M.D. Fla. June 10, 2009) (stating that use
of pepper spray may be reasonable where an individual is "refusing police
requests, such as requests to enter a patrol car or go to the hospital"
(quoting Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002))). Further,
Alday's interest not to be tased and suffer two small, fully healable burns
that cause moderate pain for a few days is outweighed by the governmental
interest in efficient arrests and ensuring compliance with orders. See
Buckley, 292 F. App'x at 794. At the very least, Groover would be entitled
to qualified immunity because the use of the Taser was discretionary and did
not violate clearly established law. See, e.g., Sanders v. City of Dothan,
409 F. App'x 285, 290 (11th Cir. 2011) (per curiam) (providing qualified
immunity for tasering an uncooperative, handcuffed arrestee in the back of a
police car when the officer was acting in furtherance of a legitimate law-
enforcement activity).

AO 72A
(Rev. 8/82)

b. Fourteenth Amendment Analysis

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Groover's actions shocked the conscience and thus violated the Fourteenth Amendment. The Fourteenth Amendment's "standard for showing excessive force . . . is higher than that required to show excessive force in violation of the Fourth Amendment." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam). While the Fourth Amendment uses an "objective reasonableness" standard, Fourteenth Amendment claims entail a subjective component and requirement that actions "shock the conscience." See id. (discussing the Fourteenth Amendment's higher standard). If force is used "maliciously and sadistically to cause harm," then it shocks the conscience, but if it is applied "in a good-faith effort to maintain or restore discipline," then it does not. Id. (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

Courts consider several factors to determine whether an official used excessive force in violation of the Fourteenth Amendment:

> a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the [detainee]; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response.

AO 72A
(Rev. 8/82)

Id. (citing Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007)). The Court views facts "as reasonably perceived by [the defendant] on the basis of the facts known to him at the time" and gives a wide range of deference to officials acting to preserve discipline and security. Id.

### i. Need for Application of Force

The first factor weighs in Defendant's favor. Alday failed to follow an officer's lawful commands for her to exit a police vehicle. Groover gave approximately 37 seconds to comply and pointed a Taser at Alday, implicitly warning her what would happen if she failed to move. Although Alday was not violent, her passive resistance impeded an efficient booking process, and some force was due. See Fennell, 559 F.3d at 1218 ("[Eleventh Circuit] precedent permits the use of force even when a detainee is not physically resisting."). Although Alday was not posing a danger, an official need not wait until disturbances are dangerous before using force to restore order. Id. (citing Cockrell, 510 F.3d at 1311). Alday had no right to have another officer assist her from the sally port into the detention center, as she requested. Therefore, the application of force was warranted.

*ii. Relationship between the Need for and*

*Amount of Force*

As to the second factor, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Groover subjectively intended to use more force than was absolutely required. The Eleventh Circuit countenances use of a dry-stun Taser as relatively safe and effective in coercing an individual's obedience. See Hoyt v. Cooks, 672 F.3d 972, 980 (11th Cir. 2012) (stating that using a dry-stun Taser is "a much less serious application" of force, compared to a prong-mode Taser, that "results only in pain, a burning sensation"); Harper v. Perkins, 459 F. App'x 822, 826 (11th Cir. 2012) (per curiam) (suggesting that Tasers provide a "moderate, non-lethal level of force"). Indeed, in other cases, the Eleventh Circuit has found that more severe force—sufficient to break bones—is permissible even where an individual does not offer physical resistance. Fennell, 559 F.3d at 1218; see also Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) (determining that grabbing a prisoner's throat and shoving him against prison bars was reasonable). Looking at the situation at hand, the force efficiently satisfied its purpose in getting Alday to exit the vehicle.

Although the use of the Taser is not a severe method of pain compliance, its use must be measured against its need.

AO 72A
(Rev. 8/82)

There is no doubt that it was actually effective in meeting its intended purpose, as Alday immediately thereafter exited the vehicle and complied with Groover's orders.

Yet, it is possible that even less force would have wrought the same result.  By merely trying to assist Alday out of the vehicle without resorting to pain compliance, or asking another officer for assistance (as Alday requested), Alday might have been removed without anyone getting hurt.  Further, given that Groover thereafter lied about why he used force, claiming that Alday tried to kick him, there is evidence that Groover afterward thought that the force may have exceeded what was warranted by the actual facts.  Moreover, Alday testified that Groover was angry during the transport.  From this, a reasonable jury could conclude that the amount of force was not necessary and could have been partially motivated by anger rather than a good-faith intent to carry out the government's lawful prerogatives.  Therefore, the second factor weighs in Plaintiff's favor.

### iii. Extent of the Injury

Because Alday's injury was minor, the third factor cuts for the reasonableness of the force.  The undisputed evidence reveals a de minimis injury.  The tasering caused two small burn marks on Alday's neck and moderate pain for "a few days."  Dkt. No. 31-2 ¶ 65.  Alday was "healed" after a "few weeks," with no

AO 72A
(Rev. 8/82)

scarring.  Id. ¶ 66.  Alday treated her own wounds and did not
need to visit a medical professional.  Therefore, this factor
cuts significantly in Defendant's favor.

### iv. Extent of Threat to Staff and Inmates

Most helpful for Plaintiff's case, her threat to staff and
inmates was almost nonexistent.[6]  Plaintiff was a small, somewhat
intoxicated woman sitting handcuffed in the backseat of a car,
which was parked in an enclosed sally port.[7]  She had not even
been exposed to other inmates or staff.  Although the force
garnered expedient compliance and control, the Court cannot find
that Alday posed any substantial threat—even if the Court viewed
the facts favorably for Defendant.  Therefore, this factor cuts
for excessiveness.

### v. Efforts to Temper Severity

Given that Alday's resulting injury was minimal, little
effort was needed to mitigate the effects of the force that was
applied.  Fennell, 559 F.3d at 1220.  The parties have not

---

[6] There appears to be some overlap between this factor and the second.  To
analyze the relationship between the amount of force and the need for force,
the Court believes that an inquiry into the threat posed to others would be
an appropriate consideration.

[7] The fact that Alday was in handcuffs weighs significantly against any
finding that she posed a threat to others or herself.  See, e.g., Ledlow v.
Givens, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam) (stating that no
threat was posed after an inmate was secured in handcuffs); Wells v. Cramer,
262 F. App'x 184, 188 (11th Cir. 2008) (per curiam) (finding "that level of
force may not have been justified once [the suspect] was handcuffed and had
ceased resisting because he may have ceased to pose a threat to the
officers"); Hargrove v. City of Montgomery, No. 2:10-cv-294-MEF, 2012 WL
917293, at *9 (M.D. Ala. Mar. 19, 2012) ("[T]he Eleventh Circuit considers
the need for the application of force to drop significantly once the suspect
is secured in handcuffs.").

AO 72A
(Rev. 8/82)

proffered evidence on whether Groover should have expended greater effort to mitigate the Taser's effects. Given the low severity of the injury, the evidence reveals no impropriety and therefore cuts in Defendant's favor. However, given the totality of the circumstances, this factor deserves little weight in the Court's analysis.

### vi. Conclusion

Although the factors cut in different directions, the Court holds that no reasonable jury could find that Groover was motivated by a malicious and sadistic intent to cause harm that shocks the conscience, rather than a good-faith effort to gain Alday's compliance. There was a need for force, although reasonable individuals could disagree on whether use of a dry-stun Taser was necessary to achieve swift compliance. Further, although Alday posed little threat to herself, Groover, or others, the harm was minor and required no medical assistance.

The case has certain factual similarities to Skelly v. Okaloosa County Board of County Commissioners, 456 F. App'x 845, 848 (11th Cir. 2012) (per curiam). There, the plaintiff's version of events presented a situation in which officers knocked the plaintiff to the floor and tasered her up to sixteen times, even while the plaintiff was unconscious. Id. The officers' force was based on no disturbance or indication that the plaintiff was a threat, and as a result, the plaintiff was

AO 72A
(Rev. 8/82)

taken to the hospital for hitting her head, an abraded eye, loss of consciousness, and several burns on her body. Id. As a result, the officers' alleged conduct could amount to a Fourteenth Amendment violation. Id. at 848-49.

In contrast, the case at bar presents a situation where there is no dispute that Alday was disobeying lawful commands, suffered a single dry-stun, and incurred minimal injuries. Compared to Skelly, Groover's use of a Taser was much more proportionate to its need—that is, not shocking. Although a jury could find, as Groover's employer did, that a single dry stun was more force than needed, it could not find the force to be constitutionally excessive. Therefore, summary judgment is appropriate on Plaintiff's excessive force claim.

### 3. Attorney's Fees

Count 8 alleges that Defendant is liable for attorney's fees and expenses under 42 U.S.C. § 1988. Dkt. No. 1 ¶¶ 41-42. Attorney's fees are recoverable only for the "prevailing party." 42 U.S.C. § 1988(b). Because Plaintiff has failed to show any right to relief, Count 15 is **DISMISSED**.

AO 72A
(Rev. 8/82)

B. <u>State Law Claims</u>

1. Assault, Battery, and Wrongful Detention

Count 2 asserts a number of state-law causes of action, including assault, battery, and wrongful detention.[8] Dkt. No. 1 ¶¶ 28-29. For the Officer to be found personally liable, Plaintiff must show that he is not entitled to qualified immunity. In Georgia, qualified immunity "protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption." <u>Cameron v. Lang</u>, 274 Ga. 122, 123(1) (2001) (quoting <u>Teston v. Collins</u>, 217 Ga. App. 829, 830(1) (1995)). "[A] public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." <u>Id.</u>

As with the federal claims, Groover is entitled to qualified immunity and cannot be held personally liable for his use of force because Alday has not produced any evidence of malice. See <u>Russell v. Barrett</u>, 296 Ga. App. 114, 119(1) (2009) (dismissing assault and battery claims for failure to show that a sheriff's deputy acted with malice or intent to injure).

---

[8] Count 2 also seeks relief for negligent infliction of emotional distress, intentional infliction of emotional distress, and "all other state law claims available." Dkt. No. 1 ¶ 29. The Court has addressed these claims separately, as Plaintiff asserted them as independent counts elsewhere in the Complaint. See <u>id.</u> ¶¶ 35-38.

AO 72A
(Rev. 8/82)

Rather, all Plaintiff could show is that the Officer applied more severe force than was absolutely necessary—in furtherance of lawful prerogatives while partially fueled by anger—to coerce her exit from his vehicle. See Taylor v. Waldo, 309 Ga. App. 108, 111-12(2) (2011) (concluding that throwing a person to the ground for not pulling out an identification card was unnecessary but not done with malice). In finding that Groover's actions do not meet the Fourteenth Amendment's shock-the-conscience standard, the Court implicitly rejected that his actions were malicious. Cf. Fennell, 559 F.3d at 1217 (stating that an action shocks the conscience if it is used "maliciously and sadistically to cause harm"). Further, because there is no cognizable Fourth Amendment claim for unlawful seizure, neither is there a state claim for wrongful detention. See Durden v. State, 250 Ga. 325, 327(1) (1982) ("An arrest and search, legal under federal law, are legal under state law."). Therefore, Alday's claims for assault, battery, and wrongful detention are **DISMISSED.**

2. Intentional Infliction of Emotional Distress

Count 5 alleges that Defendant is liable for intentional infliction of emotional distress. Dkt. No. 1 ¶¶ 35-36. To succeed on this claim, Plaintiff must establish four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a

AO 72A
(Rev. 8/82)

causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." Hendrix v. Phillips, 207 Ga. App. 394, 395(1) (1993) (quoting Bridges v. Winn-Dixie Atlanta, Inc., 176 Ga. App. 227, 230(1) (1985)) (internal quotation marks omitted).

Plaintiff has failed to show that Defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Phinazee v. Interstate Nationalease, Inc., 237 Ga. App. 39, 40 (1999) (quoting Bowers v. Estep, 204 Ga. App. 615, 618(2) (1992)). Rather, it follows from Groover having qualified immunity for the underlying conduct that he is protected from liability for intentional infliction of emotional distress. Conley v. Dawson, 257 Ga. App. 665, 668(3) (2002). Therefore, Count 5 is **DISMISSED**.

        3. Negligent Infliction of Emotional Distress

In addition to his claim for intentional infliction of emotional distress, Plaintiff seeks redress for negligent infliction of emotional distress under Count 6. Dkt. No. 1 ¶¶ 37-38. In Georgia, such a claim requires a plaintiff to show "(1) a physical impact to the plaintiff; (2) the physical impact cause[d] physical injury to the plaintiff; . . . (3) the physical injury to the plaintiff cause[d] the plaintiff's mental

suffering or emotional distress"; and (4) negligent conduct. Clarke v. Freeman, 302 Ga. App. 831, 836(1) (2010). Just as qualified immunity protects Defendant from liability for intentional infliction of emotional distress, qualified immunity shields Groover from liability for this cause of action. Therefore, Count 6 is **DISMISSED**.

### 4. Punitive Damages

Count 7 alleges that Defendant is liable for punitive damages. Dkt. No. 1 ¶¶ 39-40. Punitive damages may be awarded as a matter of federal law under 42 U.S.C. § 1983 or Georgia law under O.C.G.A. § 51-12-5.1. See Smith v. Wade, 461 U.S. 30, 56 (1983). As to recovery under federal law, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. Similarly, under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b).

AO 72A
(Rev. 8/82)

Plaintiff has failed to demonstrate a right to recover under any theory of liability and has provided no evidence to support anything approaching the level of culpable conduct required to entitle Plaintiff to punitive damages. Therefore, Count 7 is **DISMISSED**.

## V. Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment is **GRANTED**. Dkt. No. 31. The Clerk of Court is instructed to close the case.

**SO ORDERED**, this 31ST day of March, 2014.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)